IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DORA LUISE ZUBAL, | ) | CASE NO. 1:16CV189 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Dora Zubal ("Zubal") seeks judicial review of the final decision of Defendant
Commissioner of Social Security ("Commissioner") denying her application for Disability
Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has
jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate
Judge pursuant to the consent of the parties.  Doc. 14.

As explained more fully below, any purported challenge that Zubal makes with respect to
Defendants' denial of her DIB application is **DENIED**.  Regarding her SSI application, the ALJ
did not sufficiently explain the weight he gave to the opinions of Zubal's treating physician, Dr.
Appleby, and the consultative examiner, Dr. Ghoubrial.  Accordingly, the Commissioner's
decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

## I. Procedural History

In January 2012, Zubal protectively filed applications for DIB and SSI, alleging a
disability onset date of December 31, 2001.  Tr. 12, 228, 230.  She alleged disability based on the
following: lupus, Raynaud's disease, scleroderma, glaucoma, neuropathy, and depression.  Tr.
232.  After denials by the state agency initially (Tr. 89, 90) and on reconsideration (Tr. 103,

1

104), Zubal requested an administrative hearing.  Tr. 129.  A hearing was held before

Administrative Law Judge ("ALJ") Charles Shinn on July 2, 2014 (Tr. 10-60).  In his July 18,

2014, decision (Tr. 12-24), the ALJ determined that Zubal could perform jobs that exist in

significant numbers in the national economy, i.e., she was not disabled.  Tr. 22.  Zubal requested

review of the ALJ's decision by the Appeals Council (Tr. 8) and, on December 4, 2015, the

Appeals Council denied review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Zubal was born in 1965 and was 46 years old on the date her applications were filed.  Tr.

228.  She has a GED and no past relevant work.  Tr. 35, 51.

### B.  Relevant Medical Evidence[1]

On May 24, 2006, Zubal saw rheumatologist Marie Kuchynski, M.D., for a consultation.

Tr. 316.  She was referred by her Lupus support group.  Tr. 316.  Zubal stated that she was

diagnosed with lupus, systemic sclerosis and Raynaud's disease in 2004 by her former

rheumatologist.[2]  Tr. 316, 318.  Currently, she felt "miserable."  Tr. 316.  She explained that her

Raynaud's was so bad when she was first diagnosed that she had a surgical procedure to increase

the circulation to her hands, but her condition instead worsened.  Tr. 318.  Her hands had become

progressively more swollen and she reported "significant trouble trying to use her hands for

anything."  Tr. 318.  Upon exam, her hand joints were diffusely swollen; her fingers were purple,

---

[1]  Zubal did not challenge the ALJ's findings regarding her mental impairments.  Accordingly, only the medical evidence relating to Zubal's challenged physical impairments is summarized and discussed herein.

[2]  Generally, lupus is a chronic inflammatory disease that occurs when the body's immune system attacks its own tissues and organs.  Doc. 15, p. 3, n.2.  Systemic sclerosis or scleroderma is the hardening and tightening of the skin and connective tissues.  Id.  Raynaud's disease is a vascular disorder that causes intermittent interruption of blood flow to the extremities, causing areas of the body (primarily fingers and toes) to feel numb and cold in response to cold temperatures or stress.  Id.; Doc. 18, p. 4, n.5.

diffusely swollen, and she was unable to extend them; her elbows were swollen and she was unable to extend them; her shoulders, wrists and ankles were normal; she had pain in her hips and knees upon range of motion; and her feet were positive for Raynaud's. Tr. 317. She had no telangiectasia but she did have oral ulcers.[3] Tr. 318. She had good peripheral pulses. Tr. 318. Dr. Kuchynski suspected that she "most likely had a mixed connective tissue disease" and began her on Viagra and methotrexate.[4] Tr. 317, 318. She also ordered lab work. Tr. 317.

Zubal returned to Dr. Kuchynski two weeks later to discuss her lab test results. Tr. 318. Her results for scleroderma were negative but the result of other testing was positive and consistent with mixed connective tissue disease. Tr. 318. Zubal stated that, after taking Viagra for two weeks, she started to notice some improvement. Tr. 318. Her hands were not as discolored as they were two weeks prior at her first visit and she was able to fully extend her hands with very little pain. Tr. 318. She still limped from severe pain in her legs. Tr. 318. Dr. Kuchynski noted that Zubal should start noticing improvement within the next month as she continued her methotrexate and Viagra and stated, "I sent a letter to her insurance to get approval for off label use of Viagra." Tr. 318. Meanwhile, Dr. Kuchynski provided her with Viagra and scheduled a follow-up appointment a month later. Tr. 318.

At the follow-up appointment on July 12, 2006, Zubal reported "a marked decrease in the swelling and in her severity of her Raynaud's disease. She still has significant amount of pain in her knees, hips, and shoulders and wonders if the medication is at its optimal dose, but

---

[3] Telangiectasia is skin discoloration due to the dilation of small blood vessels. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1878.

[4] Mixed connective tissue disease "has signs and symptoms of a combination of disorders — primarily lupus, scleroderma and polymyositis. For this reason, mixed connective tissue disease is sometimes referred to as an overlap disease .... Early signs and symptoms often involve the hands. Fingers might swell like sausages, and the fingertips become white and numb. In later stages, some organs — such as the lungs, heart and kidneys — may be affected." http://www.mayoclinic.org/diseases-conditions/mixed-connective-tissue-disease/basics/definition/con-20026515 (last visited 10/15/2016).

clearly she is no longer having severe cyanosis [skin discoloration] and she is able to tolerate being in air-conditioned places." Tr. 320.  Tr. 320.  Upon exam, Dr. Kuchynski observed that Zubal's hand swelling was "much less prominent," she was able to make a fist, and she had no active Raynaud's attack that day.  Tr. 320.  She still had swelling in her knees "but good range of motion in her ankles, shoulders, wrists, and elbows[.]"  Tr. 320.  Dr. Kuchynski considered an increase of methotrexate if Zubal's liver function tests were normal and scheduled a follow-up in two to three months.  Tr. 320.

Zubal saw Dr. Kuchynski again on September 13, 2006.  Tr. 322.  Zubal reported that her Raynaud's "has completely resolved with the initiation of Viagra," but that she experienced increased swelling in her hands and feet and increasing problems with her handgrip.  Tr. 322.  Zubal stated that she believed that the methotrexate was no longer working.  Tr. 322.  Upon exam, Zubal had diffuse swelling in her hands, a slight cyanotic discoloration, and problems with handgrip.  Tr. 322.  Dr. Kuchynski discontinued Zubal's methotrexate and stated that she was doing bloodwork that day "to assess the activity of her disease."  Tr. 322.  After Zubal's results were obtained, Dr. Kuchynski prescribed Imuran.  Tr. 324.

On March 5, 2007, Zubal returned to Dr. Kuchynski.  Tr. 324.  She stated that the Viagra was helping to increase mobility in her fingers.  Tr. 324.  She reported pain and swelling in her joints and skin rashes.  Tr. 324.  Upon examination, she had some sausage digits in her fingers but had no erythema and was able to fully extend her fingers.  Tr. 324.  Dr. Kuchynski stated that she had put Zubal on the lowest dose of Imuran and ordered blood work to determine whether her dose could be increased.  Tr. 324.  She also proscribed Voltaren for pain.  Tr. 324.

Zubal saw Dr. Kuchynski for a follow-up on June 4, 2007.  Tr. 326.  Her chief complaint was that she believed that she had a blood clot in her left leg because her left leg was swollen

with severe pain and she had a history of blood clots in her right leg.  Tr. 326.  She also had increased achiness and pain in the left side of her body.  Tr. 326.  Upon exam, she had normal pulses in her feet and ankles but swelling in her left leg and she appeared to be in pain.  Tr. 326.  She had diffuse swelling in her fingers and a decreased ability to make a fist.  Tr. 326.  Dr. Kuchynski ordered an ultrasound of her leg, switched her Voltaren prescription to Daypro, and set up a follow-up appointment for three months or sooner, depending on the test results.  Tr. 326.

On May 30, 2008, Zubal saw Dr. Kuchynski.  Tr. 310.  She reported that she had been taking her medications and that she was feeling better.  Tr. 310.  She had decreased swelling and improved vascular circulation.  Tr. 310.  She had been without her Viagra for some time because of insurance problems, but she had an ample supply at the time of her visit.  Tr. 310.  Upon exam, Dr. Kuchynski noted that Zubal "does clearly have decreased swelling in her hands and is able to wear rings."  Tr. 310.  Her fingers were not as cold and the discoloration was gone.  Tr. 310.  She had no pain upon range of motion in any of her joints, although she still had livedo reticularis[5] on her legs.  Tr. 310.  Dr. Kuchynski stated that Zubal's mixed connective tissue disease appeared to be responding to therapy.  Tr. 310.

On August 29, 2008, Zubal saw Dr. Kuchynski for a follow-up visit.  Tr. 311.  She stated that she was feeling much better and tolerating her medications well.  Tr. 311.  She still had some "mild problems with stiffness in her hands."  Tr. 311.  Upon exam, Zubal had some mild diffuse swelling in her fingers, but no cyanosis and "her mobility was much better."  Tr. 311.  She had no rashes or synovitis in any of her joints.  Tr. 311.  Dr. Kuchynski noted that her mixed

---

[5] Livedo reticularis "is a vascular response to any of various disorders, caused by dilation of the subpapillary venous plexus as a result of both increased blood viscosity and blood vessel changes that delay flow away from the skin."  Dorlands, at 1067.

connective tissue disease was responding to therapy and that she would continue to monitor her liver functioning.  Tr. 311.

Zubal saw Dr. Kuchynski again about a year later, on September 2, 2009.  Tr.  312. Zubal reported that most of her symptoms had been relatively stable since her last appointment and that she came to this appointment for a medication refill.  Tr. 312.  She complained primarily of left hip pain.  Tr. 312.  Upon exam, she had cold fingers but no active Raynaud's attack.  Tr. 312.  She had full extension and flexion of her fingers, an improvement from the year before, "clearly showing that there is decreased synovitis and inflammation in her tendons." Tr. 312. She had no synovitis in any of her other joints but a hip exam revealed some discomfort.  Tr. 312.  Dr. Kuchynski ordered blood work and a follow-up visit in three months.  Tr. 312.

On March 29, 2010, Zubal returned to Dr. Kuchynski for her follow-up visit.  Tr. 313. Zubal explained that she had not followed up sooner "since she has been caring for her ill sister and father." Tr. 313.  She reported that her finger swelling had decreased and she did not get cyanosis as much as she used to.  Tr. 313.  Upon exam, she had no synovitis, swelling or pain in any of her joints except her fingers, which were sausage digits, though decreased in size.  Tr. 313.  She had a good pulse in all four extremities, mildly cyanotic fingers, and a normal gait.  Tr. 313.  She was to follow up in three months.  Tr. 313.

On August 19, 2010, Zubal saw Dr. Kuchynski for a follow up from an ER visit.  Tr. 314. She had been cleaning the house and she bumped her left wrist, which then swelled and was painful.  Tr. 314.  She had been diagnosed with cellulitis.  Tr. 314.  Upon exam, her left forearm was tender from her wrist to her elbow; she also had decreased swelling.  Tr. 314.  Her other joints were normal.  Tr. 314.  Dr. Kuchynski ordered an MRI of her left forearm and a follow-up visit in three months.  Tr. 314.

Zubal next saw Dr. Kuchynski on June 2, 2011.  Tr. 315.  She reported that she had no worsening pain, stiffness or swelling since her last visit and that her medications were working to keep her symptoms under control.  Tr. 315.   She still had pain in her left hip and stated that it caused her to have trouble walking, that her hip would give out, and that she had fallen several times.  Tr. 315.  She had no rashes and no fatigue.  Tr. 315.  Upon exam, her joints were normal except for her left hip, which had a limited range of motion and pain with movement.  Tr. 315.  She walked with a limp but had normal pulses in all extremities and a normal neurological examination.  Tr. 315.  Zubal was to follow up in three months.  Tr. 315.

On August 30, 2011, Zubal reported to her primary care physician, Robert Cain, M.D., that she had had throbbing left arm pain for five to six months.  Tr. 334-335.  The pain was "only on the ventral aspects of the fourth and fifth digits on the wrist and volar forearm up to just proximal to the elbow."  Tr. 335.  She felt "some sense of weakness" and some pain in her neck at times also.  Tr. 335.  Upon exam, she had some neck spasms on her right side extending into her trapezius where she had multiple trigger points.  Tr. 335.  Dr. Cain ordered an x-ray and referred Zubal to physical therapy to work on her muscle spasm.  Tr. 335.  He opined that her left forearm pain may have more to do with her connective tissue disease than nerve pain.  Tr. 335.  An x-ray of Zubal's cervical spine was positive for degenerative changes at C5/C6.  Tr. 339.

On July 11, 2012, Zubal returned Dr. Kuchynski.  Tr. 413.  Zubal stated that her Raynaud's was not worse but that she still had finger swelling and a rash.  Tr. 413.  Dr. Kuchynski wrote, "On further questioning, [Zubal] went off Imuran 7 months ago.  States that neurologist told her gabapentin was better for pain.  I informed [Zubal] that Imuran not for pain but for her connective tissue disorder.  Advised [Zubal] to restart to decrease her symptoms."  Tr.

413.  Upon exam, Zubal had a rash on her arms, a normal gait and normal joints, except for her fingers, in which she had fusiform swelling.  Tr. 413.

On November 12, 2012, Zubal saw Andrew Huang, M.D., complaining of a lower backache that she had had for four days that had radiated to her left abdomen.  Tr. 370-372.  Upon exam, she had normal muscle strength in her arms and legs.  Tr. 371.  She had no rash, cyanosis, or edema.  Tr. 371.  Dr. Huang opined that her pain could be a muscle strain.  Tr. 371.

On November 14, 2012, Zubal saw Dr. Kuchynski for a follow-up visit.  Tr. 404.   She informed Dr. Kuchynski that she may have a kidney stone.  Tr. 404.  She reported no worsening pain or stiffness but increased swelling.  Tr. 404.   Her medications were working to keep her symptoms under control.  Tr. 404.  She had no rashes, a normal neurological exam, a normal gait, normal pulses, and normal joints (no warmth, tenderness, swelling, synovitis), including all her finger joints, except for her hands, in which there was diffuse swelling.  Tr. 404.  Dr. Kuchynski advised Zubal to continue her medications.  Tr. 404.

On July 17, 2013, Zubal saw Dr. Kuchynski.  Tr. 396.  Zubal again reported no worsening stiffness, swelling or pain since her last visit.  Tr. 396.  Her medications were "partially" working to keep her symptoms under control.  Tr. 396.  She had no worsening fatigue but positive Raynaud's when exposed to cooler temperatures.  Tr. 396.  She had a rash and was seeing a dermatologist.  Tr. 396.  Upon exam, Zubal had a normal gait and normal pulses, joints, and neurological findings.  Tr. 396.  She had psoriasis.  Tr. 396.  Dr. Kuchynski again ordered lab work to assess her disease activity.  Tr. 396.  Zubal requested a walker "for days when she has more pain and feels unsteady."  Tr. 396.

On September 23, 2013, Zubal saw neurologist Kristin Appleby, M.D.  Tr. 504.  Dr. Appleby's summary of Zubal's last visit, in November 2012, included a notation that Zubal's

8

restless leg syndrome symptoms had been well controlled until about 2 weeks prior, at which time she was started on Seroquel, and that "this may be the culprit."  Tr. 504.   Zubal's current complaint included that she had fallen 2 weeks ago and scraped her leg.  Tr. 504.   She stated that her feet and hands were turning purple, especially with the cooler weather, and wondered if it was circulation.  Tr. 505.  Her legs were also swelling and her shoe sized had increased by 1.5.  Tr. 505.  She was on a diuretic for her edema; Dr. Appleby stated, "No etiology for the swelling."  Tr. 505.  She had "pain from head to toe," her arms would get numb, and her legs were giving out, although she reported falling less since she got her walker, cane, and her bathroom adapted.  Tr. 505.  Upon exam, her gait was antalgic but stable with a cane.  Tr. 506.  Dr. Appleby advised Zubal to discuss her worsening Raynaud's symptoms with her rheumatologist.  Tr. 507.

On November 13, 2013, Zubal saw Dr. Kuchynski.  Tr. 430.  She reported "a lot of pain and swelling."  Tr. 430.  She was taking NSAIDs for her pain but they were not controlling it.  Tr. 430.  She had no worsening rashes or fatigue and her Raynaud's was only active with cold weather.  Tr. 430.  She had normal pulses, a normal gait, and normal joints, except for "sclerodactyly."[6]  Tr. 430.  Dr. Kuchynski prescribed Lasix for her swelling and Ultram for her pain.  Tr. 430.

On March 5, 2014, Zubal saw Dr. Kuchynski for a follow-up visit.  Tr. 489.  The treatment note stated that no medication changes occurred at the last visit and that Zubal was currently experiencing symptoms; the onset of these symptoms was gradual, occurred intermittently, and the pain was achy.  Tr. 489.  Stress and cold exacerbated her symptoms and rest relieved them.  Tr. 489.  Her symptoms did not include malaise or fever.  Tr. 489.  Overall, Zubal had a good tolerance of treatment and fair symptom control.  Tr. 489.  She had no back

---

[6]  Sclerodactyly is a hardening and thickening of the skin of the fingers.  *See* Dorland's, at 1679.

pain, no morning stiffness, no localized joint pain, no joint swelling, no muscle weakness, no

skin lesions, no rashes, no clubbing and no nail abnormalities."  Tr. 489-490.   Upon physical

examination, Zubal had a normal gait, fingernail clubbing, Raynaud's phenomenon and

sclerodactyly, no joint swelling, normal skin color and no visible rash.  Tr. 493.  Dr. Kuchynski's

impression was that Zubal's disease appeared stable and her Raynaud's more active in cold

weather.  Tr. 494.

### C.  Medical Opinion Evidence

### 1. Treating Physician

In May or June 2006 and in February 2008,[7] Dr. Kuchynski wrote a "Letter of Medical

Necessity" on behalf of Zubal for purposes of obtaining insurance approval for off label use of

Viagra.  Tr. 368.  Dr. Kuchynski's letter states, in pertinent part, that Zubal is a new patient "who

unfortunately has systemic lupus erythematosus, scleroderma and Raynaud's phenomenon" and

"is most limited by the Raynaud's disease as she has severe vasospastic disease and swelling.

She is unable to use her hands."  Tr. 368.  She had been on all the standard medications used to

treat her symptoms to no avail.  Tr. 368.  Dr. Kuchynski stated, "[her] disease is extremely

disabling."  Tr. 368.

On August 5, 2013, Ernest Michaud, an occupational therapist, completed a functional

capacity evaluation on Zubal at the request of treating neurologist Dr. Appleby.  Tr. 512-515.

Zubal reported to Michaud that she had fallen the day before and that her left hip was tender.  Tr.

512.  She also complained of "many things wrong" and falling often and she admitted that she

---

[7] The letter is undated.  The letter was apparently sent to the insurance company after Zubal's first visit with Dr.
Kuchynski.  See Tr. 318 (Dr. Kuchynski's treatment note dated June 8, 2006, stating that she had sent a letter to
Zubal's insurance company to obtain medication approval).  A handwritten notation on the letter dated February 29,
2008, reads, "No change in medical necessity.  Medication still required."  Tr. 368.  This handwritten notation
would appear to coincide with Zubal's statement to Dr. Kuchynski in May 2008 that she had been without her
Viagra because of insurance problems.  Tr. 310.  In other words, it appears as though Dr. Kuchynski drafted and sent
the letter to Zubal's insurance company in 2006 and then resent the letter in 2008 for continued approval.

did not always use her cane or walker.  Tr. 512.  She stated that she had "already broke my arm at the distal radius and a toe too."  Tr. 512.  Her pain was currently at 9/10 and was throughout her body.  Tr. 512.   Michaud's examination consisted of some subjective testing, including Zubal filling out "surveys of function."  Tr. 512-513.  Upon physical exam, her range of motion was painful in her back, shoulders, left elbow, and both wrists.  Tr. 513-514.  Her carrying and handling scores were well below normal.  Tr. 513, 515.  She exhibited unsteadiness while carrying; she could not safely carry a maximum of 5 pounds a distance of 30 feet.  Tr. 513.   She completed the 9-hole peg test in 52.83 seconds for her right hand (normal is 19.5 seconds) and 54.10 seconds for her left hand (normal is 22.0 seconds).  Tr. 519.  Tr. 513.  Michaud concluded: "I do not believe she would be effective at an 8 hour day with modifications with these issues at this time so she is not even an effective Sedentary with modifications worker."  Tr. 515.  Thus, he classified her as "somewhat less than sedentary."  Tr. 515.

On September 23, 2013, Dr. Appleby filled out a medical opinion form by writing, "See attached FCE," integrating by reference Michaud's evaluation and opinion.  Tr. 510.

### 2. Consultative Examiner

On August 7, 2012, Zubal saw Sam Ghoubrial, M.D., for a consultative examination.  Tr. 357-361.  Zubal told Dr. Ghoubrial that she was unable to work predominately because of complications of lupus.  Tr. 357.  She reported Reynaud's disease, poor circulation in her hands and feet, and pain in her legs at a 7/10 and in her feet a 10/10.  Tr. 357.  Dr. Ghoubrial noted, "negative for any change in hair or nails, rashes, or skin lesions" and no musculoskeletal issues: "negative connective tissue disease."  Tr. 358-359.  Upon examination, she had no cyanosis or rash and her skin elasticity was within normal limits.  Tr. 359.  Her hands were "somewhat cold" to the touch.  Tr. 359.  She had "mild swelling" in the metacarpal phalangeal joints of her hands

but her pincer movements and fine coordination appeared to be within normal limits.  Tr. 360.

Her grip strength was "RT: 2# 2# 1#   LT: 1# 1# 0#."  Tr. 359.  The veins in her lower

extremities were normal.  Tr. 360.  She was able to get on and off the exam table without

difficulty, could heel to toe walk, and did not use a cane or walker.  Tr. 361.  Dr. Ghoubrial

performed manual muscle testing and Zubal scored normal in all areas except that her

dynamometer readings regarding grip strength were abnormally low.  Tr. 353-356.  Dr.

Ghoubrial assessed that Zubal had the following diseases: lupus, glaucoma, Raynaud's

phenomenon, restless leg syndrome, mixed connective tissue disease, and sleep apnea.  Tr. 365.

He concluded, "[Zubal] would have no difficulty sitting, standing, hearing, speaking, seeing, or

traveling. I don't feel she would have any difficulty lifting or carrying objects less than ten

pounds for four hours in an eight hour day."  Tr. 361.

### 3. State Agency Reviewers

On August 28, 2012, state agency physician Gerald Klyop, M.D., reviewed Zubal's file.

Tr. 69-76.  Regarding Zubal's residual functional capacity ("RFC"), Dr. Klyop opined that Zubal

was able to perform work at the light exertional level with limited bilateral fingering and must

avoid concentrated exposure to extreme cold and moderate exposure to hazards.  Tr. 68-70.

On January 14, 2013, state agency physician Gary Hinzman, M.D., adopted Dr. Klyop's

findings except that he opined that Zubal had no manipulative limitations.  Tr. 99-100.

### D.  Testimonial Evidence

### 1.  Zubal's Testimony

Zubal was represented by counsel and testified at the administrative hearing.  Tr. 32-50.

For the past two years she had been living in a house with her father and sister.  Tr. 36.  Her

father has health issues and her sister does not work outside the home, but instead takes care of Zubal and her father.  Tr. 36.  Her father's retirement provides income for the household.  Tr. 36.

Zubal listed all her medications that she is currently taking.  Tr. 36-38.  When asked if she has side effects from her medications, she stated that she has impairments such as tiredness, joint swelling, sore joints, legs giving out, and blurry vision, but that she was not sure whether the medications or her diseases cause these impairments.  Tr. 38-39.  When asked how her lupus affects her, she answered, "I want to do stuff, but my body won't allow me to do stuff.  It affects my legs, my hands, my arms, my whole body."  Tr. 40.  For example, her legs give out: "It's a lot to do with the Raynaud's [] because no circulation [in] my hands and feet."  Tr. 40.  She has tried going to a lupus support group in addition to taking medications for her lupus.  Tr. 40.  She attends "maybe once every two weeks."  Tr. 40.  She also sees a doctor every two weeks, a counselor, and attends AA meetings.  Tr. 41-42.  She also goes to church.  Tr. 43.

When asked if her lupus is affected by weather, Zubal stated that it is, explaining, "that leads to the mixed tissue disorder, if I'm allowed to go there, I —because of the circulation my hands and feet will turn white like—like they're embalmed and then they go black and I have no feeling in my feet or hands.  And they've tried the surgery and it did not work."  Tr. 40-41.  She had the surgery six years prior to the hearing.  Tr. 41.  The ALJ asked Zubal, "how effective is your medication?  Does the medication help you with your lupus pain?" and Zubal answered, "Yeah, the pain medicine, yes."  Tr. 41.

On days that she does not go to a doctor's appointment, Zubal spends the day watching television and tries to do some walking and different exercises, "if permitted.  Other than that it's nothing."  Tr. 42.  She does not cook; "my sister does that."  Tr. 42.  She stopped cooking when she started losing feeling in her hands and could not tell the difference between hot and

13

cold, "probably eight, nine years [ago] now".  Tr. 42.  The ALJ remarked that Zubal had indicated in a function report she filled out in 2012 that she was able to make sandwiches and use the microwave.  Tr. 43.  Zubal said that she can do that; "I thought you meant cooking on a stove."  Tr. 43.  Her sister does laundry and brings it to her and she folds the laundry.  Tr. 43.  She no longer drives "because of the glaucoma at night" and "now without knowing the feeling when my hands and feet give out, I can't take that chance."  Tr. 43.  The ALJ asked her if she helps take care of her father and she answered that she did not.  Tr. 44.  The ALJ mentioned that Zubal had told one of her doctors in 2010 that she had not been to see the doctor in about a year because she had been taking care of her sister and her father, but Zubal did not recall that.  Tr. 44.

Zubal testified that her sister helps her shower by walking her into the shower "and she bathes me basically because I can't tell hot from cold water."  Tr. 45.  Zubal's sister also helps her get dressed; "buttons, zippers, ... stuff that I can't normally do.  That I—when I don't feel it."  Tr. 45.  There are not really any days that she can button or zipper but she can "pull up."  Tr. 45.  She is able to feed herself.  Tr. 45.  When asked what is the longest period of time that she can use her hands for any activity, Zubal replied, "it all depends on when they give out."  Tr. 46.  She stays away from the cold because "everything goes numb, white, and then black[.]"  Tr. 46.  She stopped smoking cigarettes but is "doing the electronic cigarettes."  Tr. 47.

Zubal explained the problems with her legs: "with the neuropathy and everything they just give out.  From my hips down."  Tr. 47.  The last time she fell was about four months ago when she was trying to go down steps.  Tr. 48.  She has trouble with steps; "I don't know if it's just strength or if they give out on me."  Tr. 48.  She does not believe she could work because of her circulation and body problems.  Tr. 48.  "I don't know when I would be able to hold

14

something, carry something, or fall."  Tr. 48.  The day of the hearing she was using a cane, which she has been using every day for three years.  Tr. 49.  She uses it when she is in the house and also uses a walker.  Tr. 49.  She does not trust herself to stand without the cane.  Tr. 50.  She carries it in her right hand.  Tr. 50.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Mark Anderson testified at the hearing.  Tr. 50-58.  The ALJ asked the VE whether a hypothetical individual of Zubal's age, education and work experience could perform work if the individual had the following characteristics: can perform light work as it is defined by the regulations (lift, carry, push and pull limitations of 20 pounds occasionally and 10 pounds frequently); cannot climb ladders, ropes or scaffolding; can occasionally climb ramps and stairs; can occasionally stoop, kneel, crouch and crawl; can frequently handle and finger bilaterally; must avoid workplace hazards such as unprotected heights and exposure to dangerous moving machinery; must avoid concentrated exposure to temperature extremes of hot and cold; is limited to simple, routine tasks that do not involve arbitration, negotiation, or confrontation; cannot perform work that requires strict production quotas and cannot perform piece rate work or assembly line work; and can occasionally interact with others.  Tr. 52.  The VE answered that such an individual can perform work as an inspector and hand packager (235,000 national jobs; 22,500 state jobs; 4,500 regional jobs), an assembler of electrical accessories (244,000 national jobs; 9,000 state jobs; 3,500 regional jobs), and electronics worker (240,000 national jobs; 13,000 state jobs; 3,500 regional jobs).  Tr. 53.

Second, the ALJ asked the VE whether the same hypothetical individual described above could perform work if the individual would be limited to sedentary work as it is defined in the regulations (lift, carry, push and pull limitations of 10 pound occasionally and 5 pounds

frequently).  Tr. 53.  The VE answered that such an individual could perform work as a patcher (280,000 national jobs; 25,000 state jobs; 4,500 regional jobs), a touchup screener (158,000 national jobs; 5,200 state jobs; 1,700 regional jobs); and bonder (110,000 national jobs; 10,000 state jobs; 2,500 regional jobs).  Tr. 54.  The ALJ asked the VE whether such an individual could perform work if the individual was limited to frequent, instead of occasional, handling and fingering.  Tr. 55.  The VE responded that there would be no work such an individual could perform.  Tr. 55.

Lastly, the ALJ asked the VE whether the second hypothetical individual described above would be precluded from competitive employment if that individual could only sustain a five hour work day.  Tr. 56.  The VE confirmed that such an individual would be precluded from competitive employment.  Tr. 56.

Zubal's attorney asked the VE whether the jobs he cited were assembly line jobs, given that the ALJ's hypothetical contained a restriction for no assembly line work.  Tr. 57.  The VE explained that the jobs that he cited were jobs in which the individual worked at an individual work station, not on a production line.  Tr. 57.  Zubal's attorney asked whether there would be strict production quotas in these jobs and the VE stated that the jobs he cited did not contain strict production quotas.  Tr. 57.  Zubal's attorney then asked the VE if his answer to the ALJ's first hypothetical (restricted to light work) would change if the individual's handling and fingering limitations were reduced to occasionally rather than frequently.  Tr. 58.  The VE stated that there would be no jobs such an individual could perform.  Tr. 58.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[8] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his July 18, 2014, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2001.  Tr. 14.

2. The claimant has not engaged in substantial gainful activity since December 31, 2001, the alleged onset date.  Tr. 14.

3. The claimant has the following severe impairments: systemic lupus erythematosus, Raynaud's phenomenon, depression, bipolar disorder and polysubstance abuse.  Tr. 14.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 15.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant may occasionally stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes, or scaffolds; the claimant may frequently handle and finger bilaterally; the claimant must avoid exposure to workplace hazards, including unprotected heights or dangerous moving machinery; the claimant must avoid concentrated exposure to extremes of heat and cold; the claimant is limited to the performance of simple, routine tasks that do not involve arbitration, negotiation or confrontation, undertaken in a setting free of strict production quotas, piece-rate work or assembly line work, which setting requires no more than occasional interaction with others.  Tr. 17.

---

[8] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

6.      The claimant has no past relevant work.  Tr. 22.

7.      The claimant was born on September 20, 1965 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 22.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 22.

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work.  Tr. 22.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 22.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2001, through the date of this decision. Tr. 23.

## V. Parties' Arguments

Zubal challenges the ALJ's decision on five grounds.  These can be consolidated into four arguments that the ALJ committed errors in the following: (1) his Step Three determination when he found Zubal did not meet Listing 14.02 (Systemic Lupus Erythematosus); (2) the ALJ's treatment of the opinion evidence; (3) his credibility assessment; and (4) his RFC assessment with respect to Zubal's handling and fingering limitations.  Doc. 15, pp. 10-19.  In response, the Commissioner argues that this case only encompasses Zubal's SSI application, not her DIB application; that the ALJ did not commit errors at the challenged steps in the sequential evaluation; and that his decision is supported by substantial evidence.  Doc. 18, pp. 9-16.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curium) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. Zubal only challenges the denial of her SSI application, not her DIB application

Defendant asserts,

> It is well settled that a claimant cannot be entitled to DIB unless the claimant proves she became disabled before her date last insured. *E.g., Mullis v. Sec'y of Health & Human Servs*., 861 F.2d 991, 994 (6th Cir. 1988) (claimant has the burden of showing that he became disabled prior to the date last insured and remained continuously disabled until some time within the twelve months prior to his disability insurance benefits application); SSR 83-10. Here, Claimant's date last insured is December 31, 2001 (Tr. 13). As the ALJ points out, other than a psychological diagnosis from 2000, there is no "treatment in the record until well after the application date" (Tr. 15) .... [T]he opinions Claimant relies on in her brief significantly post-date Claimant's date last insured: Dr. Kuchynski's opinion is from 2008 and Dr. Appleby's is from 2013 (Pl. Br. at 6). Thus, the issues in this case can only relate to SSI, not DIB....

Doc. 18, pp. 9-10.  Zubal did not respond to this argument in her reply brief.  Because Zubal has not presented evidence that she became disabled before her date last insured (December 31, 2000), she is not entitled to DIB.  Accordingly, the Court finds that Zubal is only contesting the ALJ's decision with respect to her SSI application.

### B.  The ALJ did not err in his Step Three determination

Zubal argues that the ALJ erred at Step Three when he failed to find that she "satisfied the criteria of Listing 14.02."  Doc. 15, p. 11.  Listing 14.02, Systemic Lupus Erythematosus ("SLE") is

a chronic inflammatory disease that can affect any organ or body system. It is frequently, but not always, accompanied by constitutional symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss). Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ("lupus fog"), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis). Immunologically, there is an array of circulating serum auto-antibodies and pro- and anti-coagulant proteins that may occur in a highly variable pattern.

20 CFR Part 404, Subpart P, Appendix 1, Listing 14.00D1.  To satisfy Listing 14.02, a claimant

must have SLE as described above and:

>    A. Involvement of two or more organs/body systems, with:
>        1. One of the organs/body systems involved to at least a moderate level of severity; and
>        2. At least two of the constitutional symptoms or signs (severe fatigue, malaise, or involuntary weight loss).

*Id.*, Listing 14.02A.[9]

Zubal argues that she satisfies Listing 14.02A.  Doc. 15, p. 10.  The ALJ considered

whether Zubal met or equaled Listing 14.02:

>    Relevant to Listing 14.02, the record does not support involvement of two or more body systems, nor do there appear to be repeated manifestations of systemic lupus erythematosus.  Rather, the record appears to indicate that the claimant' lupus is stable with medications (4F/7), (12F/2).

Tr. 15.

Zubal argues that the ALJ did not properly evaluate Zubal's SLE because his decision is

"contrary to the office notes of Zubal's treating rheumatologist, Dr. Kuchynski."  Doc. 15, p. 11.

She criticizes the ALJ for citing only two of Dr. Kuchynski's treatment notes, from June 2011

and July 2013, and argues that, in other treatment notes from Dr. Kuchynski dated before and

after these dates, Zubal was found to have swollen hands, fingers, knees, leg; Raynaud's; edema;

---

[9] Although there is a Listing 14.02B, Zubal does not allege that she meets or equals Listing 14.02B.

and sclerodactyly.  Doc. 15, p. 11.  She cites numerous treatment notes in support of her argument.  Her argument, however, is not persuasive.

First, Zubal's reliance upon early treatment notes from Dr. Kuchynski dated prior to Zubal starting her medication regime are not persuasive evidence that the ALJ's conclusion— that she was stable on medications—was erroneous.[10]  Second, symptoms Zubal presented during the time she was being treated by Dr. Kuchynski but not taking her medication are also not persuasive evidence.  *See, e.g.*, Tr. 413 (July 2012 treatment note wherein Zubal presented with swollen fingers and a rash: Dr. Kuchynski wrote, "On further questioning, [Zubal] went off Imuran 7 months ago.  States that neurologist told her gabapentin was better for pain.  I informed [Zubal] that Imuran not for pain but for her connective tissue disorder.  Advised [Zubal] to restart to decrease her symptoms.").  Finally, Dr. Kuchynski herself repeatedly opined that Zubal's lupus was stable with medications.  *See* Tr. 315 (June 2011 "Medications are working to keep sx under control."); Tr. 404 (November 2012 (same, "stable on therapy"); Tr. 396 (July 2012 "Medications are working to keep sx under control partially"; "stable on therapy"); Tr. 430 (November 2013 "increased pain," prescribed Ultram for pain and Lasix for swelling); Tr. 489 (March 2014 treatment note history: "good tolerance of treatment and fair symptom control"; Dr. Kuchynski's impression: "disease appears stable.  Raynaud's more active with cold weather.").

Next, Zubal argues that she satisfies the criteria of Listing 14.02 "in that she had involvement of two or more organs/body systems."  Doc. 15, p. 11.  Even if Zubal could demonstrate involvement of two or more organs/body systems to at least a moderate level of severity, as set forth in Listing 14.02A(1), she does not allege that she meets the additional criteria set forth in 14.02(A)(2): "[and] at least two of the constitutional symptoms or signs

---

[10] For example, Zubal cites to Dr. Kuchynski's treatment note from Zubal's first visit to her.  Doc. 15, p. 11 (citing Tr. 322).  The correct treatment note of Dr. Kuchynski's first visit is actually Tr. 318; however, as Defendant points out, Zubal's citations to the transcript, mysteriously, are all four pages later than the correct page.

(severe fatigue, malaise, or involuntary weight loss)." 20 CFR Part 404, Subpart P, Appendix 1, Listing 14.02A (requiring a claimant to show both subsections (1) and (2)).[11]  Nor does the record support a finding that she satisfies 14.02A(2).  In other words, she has not shown that she satisfies all the requirements of Listing 14.02.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (a claimant must meet all of the specified medical criteria to meet a listing: "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987) (a claimant has the burden of showing her condition is equivalent to a listed impairment).  Because she cannot show that she satisfies the criteria of Listing 14.02, any purported infirmity in the ALJ's Step Three determination considering Listing 14.02 is harmless.  *See Todd v. Astrue*, 2012 WL 2576435 at *10 (N.D. Ohio May 15, 2012) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result," quoting *Shkarbari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005)).

### C. The ALJ did not err in assessing Zubal's credibility

Zubal argues that the ALJ erred when he assessed her credibility.  Doc. 15, p. 16.  She provides no specific argument in support of her allegation; she merely recites the reasons the ALJ gave when finding her not entirely credible and provides evidence that the ALJ allegedly "ignored" that she believes supports a contrary conclusion.  Doc. 15, pp. 17-18.  Zubal's arguments are without merit.

The ALJ, in great detail, explained why he found Zubal's statements concerning the intensity, persistence and limiting effects of her symptoms not entirely credible.  Tr. 17.  He

---

[11]  In her brief on the merits, Zubal did not allege that she satisfies Listing 14.02(A)(2).  Defendant, in her brief, points out that Zubal did not allege she satisfied 14.02(A)(2) and asserts that Zubal cannot show she satisfies 14.02(A)(2).  Doc. 18, pp. 11-12.  In her reply brief, Zubal does not mention 14.02(A)(2).

explained that, although she was diagnosed with systemic lupus erythematosus, a diagnosis that is consistent with Zubal's complaints of overall soreness and body pain, the record as a whole did not support the conclusion that her impairments precluded her from performing all types of work.  Tr. 18.  He explained that physical examination findings have largely been normal or minimal, with some stated exceptions.  Tr. 18.  He explained that Zubal takes medications that are effective in controlling her lupus and Raynaud's symptoms, her impairments were stable, and her symptoms intermittent, as stated by her treating rheumatologist Dr. Kuchynski.  Tr. 18.

The ALJ further explained,

At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following daily activities: the ability to attend to her personal hygiene and grooming, the ability to maintain an independent household, to manage her own medications, appointments and finances, to shop in stores, drive a car, watch old movies and read for pleasure, to help care for her elderly father, to attend alcoholics anonymous, a lupus support group, and church, to walk and exercise and to have her hair colored every two months (3E), (8F/3), (15F/35), (hearing testimony).  In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.  While none of these activities, considered in isolation, would warrant or direct a finding of "not disabled"; when considered in combination, they strongly suggest that the claimant would be capable of engaging in the work activity contemplated by the residual functional capacity.

A review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date (9D), which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments.  This question is also raised by the claimant's report that she filed for disability benefits because of her recent divorce (8F/2).

The claimant has made inconsistent statements on issues central to the resolution of these claims.  The claimant reports using a cane regularly (hearing testimony), and that such was prescribed for her (3E/7); however, the claimant is reported on multiple occasions to ambulate with a normal gait (7F/10), (11F/8), 12F/2), (16F/5), and careful reading of the record indicates that the claimant herself requested an ambulatory aid, on July 17, 2013 (12F/2).  The claimant reported to her treating source that she left the work force due to her physical health (15F/37), yet indicated to the consultative examiner that she stopped work to become a housewife, and then "fears and phobias" kept her from returning to work (8F/3).  As previously noted, the claimant ostensibly filed for benefits on the

24

grounds of debilitating medical conditions, yet reported to the consultative examiner that she applied for benefits because of a recent divorce (8F/2).  Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable.

Tr. 20.  The ALJ's credibility assessment is supported by substantial evidence; it must, therefore, be upheld.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (so long as there is substantial evidence to support the ALJ's credibility determination, the Commissioner's decision must be affirmed).

### C. The ALJ's consideration of opinion evidence

Zubal argues that the ALJ erred when he considered the opinions of the following: her treating sources, Drs. Kuchynski and Appleby; the consultative examiner, Dr. Ghoubrial; and occupational therapist Michaud.  Doc. 15, pp. 12-16.

#### 1. Treating source opinions

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as

a whole.  *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

### a. The ALJ did not err when he considered Dr. Kuchynski's opinion

Zubal contends that the ALJ erred when he gave "little weight" to the opinion of Zubal's treating rheumatologist, Dr. Kuchynski.  Doc. 15, p. 13.  Dr. Kuchynski's opinion, expressed in a letter sent on February 29, 2008, to Zubal's insurance company, was that Zubal was "unable to use her hands" and that her condition was "extremely disabling."  Doc. 15, p. 13; Tr. 368.  The ALJ considered Dr. Kuchynski's letter and explained why he gave it little weight:

> This opinion was dated February 29, 2008, and was issued for the purpose of securing insurance approval of several recommended drugs.  Leaving aside consideration of the potential application of SSR 96-5p, this opinion is otherwise obsolete.  The requested medications were in fact approved, and the subsequent assessments that the claimant's condition was controlled with medications and stable, were also recorded by Dr. Kuchynski (4F/7), (12F/2).  Accordingly, little weight was accorded this opinion.

Tr. 21.

Zubal argument that the ALJ erred when he characterized Dr. Kuchynski's opinion and gave it little weight fails.  She concedes that the letter predated the majority of Zubal's visits to Dr. Kuchynski (Doc. 19, p. 3);[12] she only argues that, after that date, Dr. Kuchynski "observed swelling and problems with Zubal's hands on many occasions."  Doc. 15, p. 13.   This argument is baseless.  The ALJ properly characterized the letter as an opinion written early on in Zubal's treatment for the purpose of obtaining approval of medication; observed that the medication was approved and obtained; and correctly noted that Dr. Kuchynski thereafter assessed Zubal stable and her condition controlled by medications.  In other words, Dr. Kuchynski's opinion expressed in the letter was inconsistent with the later medical record and her own treatment notes and, to

---

[12] Indeed, the first draft of the letter was apparently sent to the insurance company after Zubal's first visit with Dr. Kuchynski.  *See* Tr. 318 (Dr. Kuchynski's treatment noted dated June 8, 2006, stating that she had sent a letter to Zubal's insurance company to obtain medication approval).

the extent that she opined that Zubal's condition was "disabling," reached a conclusion on an issue reserved to the Commissioner, as the ALJ observed.  *See* 404.1527(c)(2) (the ALJ considers whether the treating source opinion is consistent with the record as a whole, the length of the treatment relationship, and the supportability of the opinion by the source's own treatment notes); SSR 96-5p. 1996 WL 374183 (whether an individual is "disabled" is an issue left to the Commissioner).

Moreover, Zubal does not and cannot dispute that the symptoms she had during later visits with Dr. Kuchynski after she was on her obtained medication were decidedly less severe than her symptoms present during visits with Dr. Kuchynski prior to Zubal obtaining her medication.  *See* Tr. 318 (at Zubal's first visit in May 2006, she had purple, diffusely swollen fingers; was unable to fully extend her hands; swelling in her elbows; pain in her hips and knees with limited range of motion; and Raynaud's in her feet; after starting Viagra for two weeks, Zubal "is starting to notice some improvement."); Tr. 320 (in July 2006, "The patient reports that since being on Viagra and methotrexate, she has noticed a marked decrease in the swelling and in the severity of her Raynaud's disease.  She still has significant amount of pain in her knees, hips and shoulders ... but clearly she is no longer having severe cyanosis and she is able to tolerate being in air-conditioned places."); Tr. 315 (June 2011, upon exam, normal joint exam in all areas, including  hands and fingers, except pain and limited range of motion in left hip; "Medications are working to keep sx under control."); Tr. 396 (July 2012, upon exam, all normal joints, including fingers; "Medications are working to keep sx under control partially."; "stable on therapy"); Tr. 404 (November 2012, upon exam, normal joints, including fingers, but diffuse hand swelling; Dr. Kuchynski wrote, "stable on therapy"); Tr. 430 (November 2013, upon exam, sclerodactyly and "increased pain," prescribed Ultram for pain and Lasix for swelling); Tr. 489

(March 2014, no joint pain or joint swelling; upon exam: fingernail clubbing, Raynaud's and sclerodactyly, normal skin, normal gait; treatment note history: "good tolerance of treatment and fair symptom control" and "intermittent symptoms"; Dr. Kuchynski's impression: "disease appears stable.  Raynaud's more active with cold weather.").

The ALJ's consideration of Dr. Kuchynski's opinion was not erroneous; Zubal's argument to the contrary is without merit.

### b. The ALJ erred when he considered Dr. Appleby's opinion

Zubal argues that the ALJ erred when he gave "little weight" to the opinion of Zubal's treating neurologist, Dr. Appleby.  Doc. 15, p.14.  Dr. Appleby opined that Zubal could perform less than sedentary work because of her lift/carry and grip/pinch limitations observed upon testing.[13]  Tr. 513, 515.  The ALJ considered Dr. Appleby's opinion:

> An opinion from the claimant's treating source, Kristen Appleby, M.D., based on a functional capacity evaluation administered by E[]rnest Michaud, OTR, indicated that the claimant was unemployable and could perform less than sedentary work.  Dr. Appleby has treated the claimant over a lengthy period and Mr. Michaud administered testing within his professional certifications; however, the conclusions, although correlative of the test results, were not consistent with the essentially normal findings on other, contemporary physical examinations included in the record (17F/3), (14F/2).  Little weight was accorded this opinion.

Tr. 21.  Zubal contends that the ALJ ignored observations made by Dr. Appleby and Michaud, which were contrary to the ALJ's conclusion.  Doc. 15, p. 14.  Defendant submits that the ALJ provided good reasons for giving little weight to Dr. Appleby's opinion and that, even if he did not, his failure to do so is harmless error.  Doc. 18, pp. 16-17.

---

[13]  Even though Michaud did the testing, Dr. Appleby ordered the evaluation (Tr. 512) and her opinion adopted Michaud's evaluation.  The ALJ treated Michaud's opinion as that of Dr. Appleby's.  Tr. 21.  Defendant, in her brief, argues that because Dr. Appleby did not conduct the testing herself, it is less compelling evidence.  Doc. 18, p. 18.  As noted, however, the ALJ did not find that Dr. Appleby's opinion was less compelling because it relied on the testing of another.  Thus, Defendant's argument is post-hoc rationalizing, which is not permitted by the Court on review.  *See S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947) (a reviewing court must judge the propriety of agency action "solely by the grounds invoked by the agency").

The Court finds that the ALJ did not provide good reasons for giving little weight to Dr. Appleby's opinion.  First, Defendant's assertion that Dr. Appleby's opinion that Zubal was "unemployable" was inconsistent with another opinion she provided on the same day that Zubal was "employable" (Doc. 18, p. 17) is not persuasive.  The other opinion referred to by Defendant was a mental functional capacity evaluation form; that Dr. Appleby did not find that Zubal's *mental* impairments rendered her unemployable is completely irrelevant to whether Dr. Appleby found Zubal's *physical* impairments to render her unemployable.

Second, the ALJ's sole reason for discounting Dr. Appleby's opinion (which he stated was "correlative of the test results") was that it was "not consistent with the essentially normal findings on other, contemporary physical examinations included in the record (17F/3), (14F/2)." The records that the ALJ cites, however, do not explain nor appear to support his conclusion. "17F/3" is a treatment note from Zubal's visit to Dr. Appleby on September 23, 2013.  Tr. 506. This cited page of Dr. Appleby's treatment note is not particularly instructive; it merely notes that Zubal had 5/5 motor strength "but limited by pain," relatively normal reflexes, intact sensation, and an antalgic gait that was stable with a cane.  Tr. 506.  On other pages of the treatment note from the September 23, 2013, visit with Dr. Appleby, Zubal reported that she was "falling less often since obtained walker, cane, adapted bathroom" and had pain "from head to toe."  Tr. 505.  "14F/2" is a treatment note from Zubal's November 13, 2013, visit to Dr. Kuchynski.  Tr. 430.  That day, Zubal reported "a lot of pain and swelling" and upon exam she had normal joints except that she had sclerodactyly.  Tr. 430.  Without further explanation by the ALJ, it is not clear what about these treatment notes the ALJ found to be inconsistent with Zubal's test results and Dr. Appleby's opinion.  Again, the opinion of Dr. Appleby was that

Zubal could perform less than sedentary work because of her lifting, carrying, gripping and pinching limitations.  Tr. 515.

The ALJ's stated reasons for giving this treating source opinion "little weight" do not make clear to this reviewer the reasons for that weight.  *Wilson*, 378 F.3d at 544.  It appears that the ALJ discounted lift/carry and grip/pinch restrictions found by Dr. Appleby, which were based on testing, because Zubal's hands sometimes outwardly appeared normal when observed upon examination, although sometimes they did not.  There is no obvious correlation between the way Zubal's hands *appeared* to a provider upon examination and what Zubal was *able to do* with her hands.  Thus, the ALJ needed to explain his basis for his conclusion that there was a correlation.  Without such an explanation, the Court cannot know why the ALJ discounted the testing performed and relied upon by Zubal's treating physician.  Because the Court cannot know the ALJ's reasons, the ALJ violated the treating physician rule and failed to give good reasons in support of his decision such that the Court cannot determine whether his decision was supported by substantial evidence.

Zubal also challenges the ALJ's assessment of Michaud's opinion.  Doc. 15, p. 15.  The ALJ assessed Michaud's opinion when he assessed Dr. Appleby's opinion.  Thus, on remand, the ALJ will also have an opportunity to reconsider his assessment of Michaud's opinion.

### 2. The ALJ erred when he considered consultative examiner Dr. Ghoubrial's opinion

Zubal argues that the ALJ erred when assessing the opinion of consultative examiner Dr. Ghoubrial.  Doc. 15, p. 14-15.  The Court agrees.  Regarding Dr. Ghoubrial's opinion, the ALJ explained,

> Little weight was accorded the opinion of the consultative physical examiner, Sam Ghoubrial, M.D., that the claimant could perform less than sedentary work for less than eight hours.  Dr. Ghoubrial examined the claimant on a single occasion and was reporting

within the bounds of his professional certifications.  However, the restrictions as
proposed find no correlation with his own examination, the sole abnormal clinical
findings from which, was mild swelling of the fingers, and that the claimant's hands were
somewhat cold to the touch (7F/8, 9).

Tr. 21.  The ALJ's explanation ignores Zubal's abnormal dynamometer readings (grip strength)

found on testing by Dr. Ghoubrial.  Tr. 353, 359.  Defendant asserts that any error by the ALJ

was harmless because an ALJ is not required to provide reasons for rejecting a consultative

examiner's opinion.  Doc. 18, p. 19.  In this case the ALJ *did* provide a reason but the reason is

insufficient because it is based on an incorrect reading of Dr. Ghoubrial's opinion.  The ALJ

listed the "sole abnormal clinical findings" as mild finger swelling and cold hands but ignored

the abnormal grip strength testing shown by dynamometer reading.  In other words, the ALJ's

assessment of Dr. Ghoubrial's opinion is based on his mischaracterization of Dr. Ghoubrial's

findings.  An incorrect reading of Dr. Ghoubrial's opinion does not provide substantial evidence

to support the ALJ's assessment of Dr. Ghoubrial's opinion.[14]

Defendant asserts that, because the ALJ gave "great weight" to the state agency

reviewers' finding that Zubal was not disabled, and the state agency reviewers, in turn, relied on

Dr. Ghoubrial's opinion when making their own findings, there is no reversible error.  The Court

disagrees because there are inconsistencies in the state agency reviewers' opinions *vis a vis* Dr.

Ghoubrial's opinion.  Both state agency reviewers gave Dr. Ghoubrial's opinion "great weight"

(Tr. 68, 98); identified his opinion as "I don't feel she would have any difficulty lifting or

carrying objects less than 10 pounds for four hours in an eight hour day (Tr. 68, 98); but then

assessed an RFC  for light work that included restrictions for lifting and carrying that were less

---

[14]  It is possible that the ALJ does not consider a dynamometer reading to be a "clinical finding."  If not, he needed
to explain why he discounted the dynamometer reading.  As with his discussion of Dr. Appleby's opinion, the ALJ
discounted test results based on the outward appearances of Zubal's hands, without any explanation. Because the
Court cannot know the ALJ's reasons, the Court cannot determine whether his decision is supported by substantial
evidence.

than those assessed by Dr. Ghoubrial: 20 pounds occasionally (1/3 or less of an 8-hour day) and 10 pounds frequently (up to 2/3 of an 8-hour day).  In other words, the state agency reviewers, despite giving Dr. Ghoubrial's opinion "great weight," rendered opinions that were not consistent with Dr. Ghoubrial's opinion and they did not explain the inconsistencies.  Thus, the ALJ's treatment of the state agency reviewers' opinions cannot serve to remedy the ALJ's mischaracterization of Dr. Ghoubrial's opinion.

### D. On remand, the ALJ will have an opportunity to reconsider Zubal's RFC

Lastly, Zubal challenges the ALJ's RFC determination.  Doc. 15, pp. 18-19.  On remand, the ALJ will have an opportunity to reassess Zubal's RFC after his consideration of the opinions of Drs. Appleby and Ghoubrial and the test results and opinion rendered by Michaud. Accordingly, the Court does not address Zubal's challenge to the ALJ's RFC determination.

### VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.[15]

Dated: October 17, 2016

Kathleen B. Burke
United States Magistrate Judge

---

[15]  This opinion should not be construed as a recommendation that, on remand, Zubal be found disabled.